UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

SELECTIVE INSURANCE COMPANY OF
SOUTH CAROLINA,

          Plaintiff/Counter-defendant,

v.

AMIT SELA,

          Defendant/Counter-claimant.

Case No. 16-CV-4077 (PJS/BRT)

FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER FOR JUDGMENT

---

Joseph F. Lulic, Kristi K. Brownson, Olivia Moreland Cooper, and Aaron
M. Simon, BROWNSON PLLC, for plaintiff/counter-defendant.

Christopher H. Yetka, LARKIN HOFFMAN DALY & LINDGREN, LTD.,
for defendant/counter-claimant.

Defendant/counter-claimant Amit Sela owns a large home in Minnetonka,

Minnesota.  Sela's property was damaged by two hailstorms.  The first hailstorm

occurred in June 2010, while the property was insured by Lexington Insurance

Company ("Lexington").  Sela submitted a claim to Lexington, and Lexington paid

$510,797.23.  Sela used a portion of that payment to repair some, but not all, of the

damage caused by the hailstorm.

The second hailstorm occurred in June 2015, while Sela's property was insured

by plaintiff/counter-defendant Selective Insurance Company of South Carolina

("Selective").  Sela submitted a claim to Selective.  During its investigation of the claim,

Selective asked Sela for information about the repairs that he had completed after the 2010 hailstorm. Sela told Selective what he had repaired and what he had not repaired, and Sela provided Selective with documentation regarding some of his repairs.

Following an investigation, Selective alleged that Sela had willfully misrepresented the extent to which he had repaired the exterior of his home following the 2010 hailstorm. Selective then filed this lawsuit seeking a declaration that it was not required to indemnify Sela because of his alleged fraud. Sela counterclaimed for breach of contract, alleging, in essence, that he had not committed fraud, and thus Selective was required to indemnify him for the losses that he suffered in connection with the 2015 hailstorm.

The Court presided over a week-long jury trial on the issue of fraud. During the trial, the parties stipulated that, if the jury found that Sela had not committed fraud, the amount of Sela's losses would be determined by a panel of appraisers rather than by the jury. After brief deliberations, the jury found that Sela had not committed fraud, and a panel of appraisers later determined that the actual cash value of the losses that Sela sustained in the 2015 hailstorm was $493,789.

This matter is now before the Court on Sela's counterclaim against Selective for denying insurance benefits in bad faith in violation of Minn. Stat. § 604.18. The Court

conducted a bench trial on Sela's bad-faith claim and now makes the following findings

of fact and conclusions of law.

## I.  FINDINGS OF FACT

Sela owns a large house with a complicated and expensive cement-tile roof.

Sela's property includes other structures, including a garage, pool house, and gazebo.

All of the structures are clad in part with copper.  Sela's property was extensively

damaged by a hailstorm on June 25, 2010.  *See* Def. Ex. 80 at 0004; Def. Ex. 142; JT[1] Pls.

Ex. 19.  At the time, the property was insured by Lexington.  Sela did not immediately

submit a claim, however, because Sela was in federal prison, serving sentences for

various fraud and tax offenses.  ECF No. 266 at 100-01; *United States v. Sela*, 08-CR-

0248(1) (PJS/JJK), ECF No. 132.

After he was released from prison, Sela submitted a claim to Lexington for the

2010 hail damage.  ECF No. 266 at 100-02.  Sela's homeowner's policy was a

replacement-cost policy, and it is important for purposes of this litigation to understand

how such policies work:

Under a typical replacement-cost policy, the insurer must first pay the actual

cash value ("ACV") of the loss.  ACV is calculated by identifying the cost to repair or

---

[1]The Court will refer to exhibits that Selective introduced at the jury trial as "JT Pls. Ex." and to exhibits that Selective introduced at the bench trial as "BT Pls. Ex."  The Court will refer to exhibits that Sela introduced simply as "Def. Ex.," because Sela's exhibits were labeled the same at both trials.

replace the damaged property and then subtracting depreciation.  Thus, if a four-year-old gazebo is destroyed by a fire, and it will cost $5000 to replace the gazebo, the ACV would be $5000 minus four years of depreciation.  If, say, the useful life of the gazebo was ten years, the depreciation might equal $2000 (40% of $5000), and the ACV might equal $3000 ($5000 minus $2000).  The insurer would pay $3000 to the policyholder.

The policyholder then has a choice.  The policyholder can choose to do nothing, pocket the $3000, and live without a gazebo.  Or the policyholder can hire a contractor to replace the gazebo.  After the gazebo is replaced and the contractor is paid, the insured can then seek reimbursement from the insurer for the amount that the cost of replacing the gazebo exceeded the ACV, up to the replacement-cost value ("RCV").  So if the insured paid $4000 to replace the gazebo, the insurer would owe him $1000; if the insured paid $5000, the insurer would owe him $2000; and if the insured paid $6000, the insured would owe him $2000.  The difference between the ACV (which the insurer must pay no matter what) and the RCV (which the insurer must pay only if the insured repairs or replaces the property) is sometimes referred to as the "holdback."

In June 2012, Lexington paid Sela $510,797.23, Def. Ex. 97, which represented the ACV of his damaged property, ECF No. 266 at 107-08.  Sela never sought any portion of the holdback.  In other words, Sela never told Lexington that the cost of the repairs had exceeded the ACV and that he was therefore entitled to part or all of the holdback.  ECF

No. 266 at 107-08, 170.  In choosing not to repair all of the damage but instead to pocket some of the ACV payment, Sela acted within his rights, and he saved Lexington money.

In July 2011—that is, after the 2010 hailstorm had damaged Sela's property, but before he had undertaken any repairs—Sela switched insurers, taking out a homeowner's policy with Selective.  ECF No. 266 at 152; Def. Ex. 60 at 0013.  Before agreeing to insure Sela, Selective inspected Sela's property, and thus Selective was able to examine all of the damage that the 2010 hailstorm had caused.  An appraisal of the home commissioned by Selective characterized the home's roof as being in "average" condition.  Def. Ex. 125 at 0003.  After examining Sela's property, Selective elected to issue a homeowner's policy that did not exclude pre-existing damage.

From 2012 to 2015, Sela repaired some, but not all, of the damage from the 2010 hailstorm.  *See, e.g.*, Def. Ex. 58 at 0006, 0101-05.  Sela owns one of Minnesota's largest roofing companies.  Using his extensive contacts within the home-exterior industry, he was able to hire companies with whom he had a relationship, and he mostly paid those companies in cash (as doing so led to "much better prices").  BT Pls. Ex. 8 at 49-52; ECF No. 266 at 170-71.  Sela did not attempt to repair his own roof because of its complexity.  *See, e.g.*, ECF No. 266 at 147-49; JT Pls. Ex. 2 at 34.

On June 29, 2015, another hailstorm hit Sela's property.  Def. Exs. 107, 124.  Sela's home, garage, pool house, and gazebo were once again damaged.  *See, e.g.*, Def. Ex. 158;

ECF No. 272 at 80.  In addition, an outdoor grill and three patio heaters sustained

damage.  *See, e.g.*, Def. Ex. 158 at 0012-14.

Sela submitted a claim to Selective on July 8, 2015.  Def. Ex. 124.  In response,

Selective sent an independent appraiser (Bryan Walton) to inspect the property.  ECF

No. 265 at 4-5, 12-13; BT Pls. Ex. 2.  After briefly examining the damage, Walton told

Sela that he had "a catastrophic claim" and that Walton would "not be handling it any

longer."  ECF No. 272 at 9; *see also* ECF No. 266 at 172-74.  Walton submitted a loss

report to Selective.  BT Pls. Ex. 2.  In his report, Walton noted that Sela told him "that

the entire exterior of [the] dwelling was redone approximately 3 years ago."  *Id.* at 0001.

About three weeks later, Selective sent two of its own employees—David Clark

and Charlie Hubbard—to inspect Sela's property.  ECF No. 265 at 41; JT Pls. Exs. 31, 32.

Clark and Hubbard (accompanied by Sela) spent several hours examining the damage.

ECF No. 265 at 42; ECF No. 266 at 175; JT Pls. Exs. 31, 32.  Sela told Clark and Hubbard

that the exterior of the home had been completely re-done five or six years ago.  JT Pls.

Ex. 31 at 13-14; JT Pls. Ex. 32 at 12.  Sela also explained that the property had sustained

damage in a prior hailstorm, and that Lexington had indemnified him for that damage.

JT Pls. Ex. 31 at 3-6; JT Pls. Ex. 32 at 3-5.  When Clark asked Sela whether "all the gutters

and everything were replaced," Sela responded "[o]h, yeah, everything was done,

replaced.  Copper.  See what they had to do—we had to take, like, a foot and a half from

around the house, the edge, because all the flashing goes right into the tile system." JT Pls. Ex. 31 at 18; *see also* JT Pls. Ex. 32 at 17-18.  During the inspection, Sela on his own initiative pointed out various items that had not been repaired after the first hailstorm. *See* JT Pls. Ex. 32 at 7-8, 16-17, 57-58, 60, 69, 76; ECF No. 265 at 57-59; *see also* JT Pls. Ex. 32 at 77-78 (pointing out that various skylights were not part of his claim).  By the time that Clark and Hubbard finished their inspection, they knew that some of the damage from the 2010 hailstorm had been repaired and some of it had not.  Sela later submitted photos to Selective on which he marked portions of his property that he had not repaired after the 2010 hailstorm.  *See* Def. Ex. 58 at 0101-05.

Clark was the adjuster assigned to the claim.  In that capacity, Clark was responsible for inspecting the property, determining if Sela had sustained a loss, and—if Sela had sustained a loss—calculating the damages and settling the claim.  ECF No. 272 at 57, 78-79.  Based on his inspection of the property, Clark determined that Sela had sustained a "significant" loss as a result of the 2015 hailstorm.  ECF No. 272 at 80.  Clark never got to the point of calculating the amount that Sela was owed, however, as Selective's Special Investigation Unit ("SIU") was involved with the case.  ECF No. 265 at 73, 76-77.

### A. Selective's Fraud Investigation

Shortly after Sela submitted his claim in July 2015, Selective received an anonymous letter that accused Sela of fraud. *See* Def. Ex. 60 at 0001; Def. Ex. 98. The anonymous author informed Selective about Sela's criminal background—noting that he was a "convicted felon" who had been found guilty of "tax evasion and fraud." Def. Ex. 98 at 0001. The author also alleged that Sela had previously submitted a similar insurance claim on the property and had received "over $585,000" from "Lloyd's of London." *Id.* Further, the author alleged that the prior damage to Sela's property had not been caused "by a natural cause/Weather," but instead by Sela directing his workers to intentionally "ding[] and damag[e]" his property so that he could collect insurance proceeds. *Id.* The author added that, if Selective investigated, it would find that Sela had not repaired the prior damage, except for spending a "few days polishing the alleged damages." *Id.* Finally, the author said "that after every significant [insurance] claim" that Sela makes, he "switch[es] to a new [insurance] carrier," thereby "abusing the system and turning it into a profit center and cash flow machine." *Id.*

Selective, understandably, decided to investigate the allegations made in the anonymous letter. Charlene Pack, a member of Selective's SIU, was assigned to Sela's claim. BT Pls. Ex. 10 at 13. Parts of the anonymous letter were quickly found to be incorrect. For example, Lexington (not Lloyds of London) had paid the previous

insurance claim, and Lexington had paid $510,797.23 (not more than $585,000).

Moreover, there was zero evidence that anyone had intentionally damaged any of Sela's

property.[2]  The property contained some "isolated" mechanical damage, such as dings

or scrapes caused by ladders being placed against the exterior of the home.  ECF

No. 272 at 93.  But Sela was upfront about that damage—telling Selective, for example,

"[t]hat's clearly damage from a worker," ECF No. 266 at 64; *see also, e.g.*, JT Pls. Ex. 32

at 8, 66.

Despite the fact that the author of the anonymous letter was quickly revealed to

be unreliable, Selective became fixated on the author's allegation that Sela had not

repaired any of the damage from the 2010 hailstorm.[3]  It is difficult to understand why

Selective became so focused on this subject, particularly because Sela did not have

much incentive to lie about this subject.  As already noted, following the 2010 hailstorm,

Lexington had paid Sela only the ACV.  Sela had no obligation to use that money to

make a single repair, as Sela never sought any portion of the holdback from Lexington.

---

[2]Both Bryan Walton and Clark inspected Sela's property and saw no evidence of intentional mechanical damage.  ECF No. 265 at 23, 110; *see also* ECF No. 272 at 64.

[3]As noted, the anonymous letter writer seemed to claim that all of the damage for which Lexington had indemnified Sela had been intentionally created, and that the 2010 hailstorm had not caused any damage.  That claim was preposterous, however, and no one at Selective took it seriously.

Moreover, Sela had a replacement-cost policy with Selective—a policy that did not contain any exclusion for prior damage.  Thus, if an item of Sela's property (say, the roof of his house) sustained a loss in the 2015 hailstorm and Sela repaired or replaced that item, then Sela was entitled to be indemnified for up to the RCV of that item—even if that item had also been damaged in the 2010 hailstorm, and even if that item had never been repaired.  Thus, *it did not matter* whether a particular piece of property had been damaged in the 2010 hailstorm—and *it did not matter* whether any damage sustained in 2010 had been repaired—with two exceptions:

First, if a piece of property (1) sustained a loss during the 2010 hailstorm (when Lexington insured Sela's property) but (2) did not sustain a loss during the 2015 hailstorm (when Selective insured Sela's property), then obviously the only loss occurred in 2010, and that loss would not be the responsibility of Selective.  But Selective has never credibly contended that there was any such piece of property.[4]

_____

[4]At the summary-judgment hearing, Selective's attorney (Kristi Brownson)—who had advised Selective throughout its handling of Sela's claim—said that she could not identify any piece of Sela's property that had been damaged in 2010, not repaired, and not also damaged in 2015.  At the jury trial, however, Selective's new attorney (Joseph Lulic)—who had not advised Selective during its handling of Sela's claim—argued that Sela had suffered no "loss" as a result of the 2015 hailstorm, because all of his property had been completely destroyed by the 2010 hailstorm, meaning that any damage caused by the 2015 hailstorm could not have reduced its value.  This argument was both new (Selective had previously suggested no such thing) and ridiculous (it contradicted, among other things, Selective's own assessment of Sela's roof as being of "average" quality despite the unrepaired damage from the 2010 hailstorm, Def. Ex. 125 at 0003,

(continued...)

Second, although the question of whether a piece of property that sustained a loss in 2015 also sustained a loss in 2010 would not affect the *RCV* that Sela might ultimately be entitled to receive from Selective, it would affect the *ACV* that Sela would initially be paid. Obviously, a piece of property that has unrepaired prior hail damage has depreciated more than a similar piece of property that does not have unrepaired hail damage. As a practical matter, then, the only thing that Sela could have gained by lying about the extent to which he had repaired property damaged in the 2010 hailstorm is inflating the ACV payment that he would receive upfront and reducing the RCV holdback that he would receive after repairing or replacing the property. It seems rather unlikely that Sela would lie to Selective—and put at risk almost a half a million dollars in indemnification—in order to inflate the ACV payment and decrease the RCV holdback.

As noted, however, Selective quickly became fixated—almost to the exclusion of everything else—with the question of what repairs (if any) Sela had made following the 2010 hailstorm. Selective asked Sela from time to time to submit documents and other evidence regarding those repairs. *See, e.g.*, Def. Exs. 48, 53, 63. Sela cooperated with Selective and submitted all of the records and other evidence in his possession. Among

_____

[4](...continued)
and Selective's own assessment that Sela had suffered a "significant" loss as a result of the 2015 hailstorm, ECF No. 272 at 80).

other things, Sela submitted invoices from five different businesses—Perfect Touch

Construction, Vassallo Fabrication and Installation, Northeast Sheet Metal, Sheridan

Sheet Metal, and Industrial Door Company—related to repairs done on his property

after the 2010 hailstorm.  Def. Ex. 58 at 0008-90.  These invoices totaled $37,960.32.  *See*

*id.*[5]  Sela also represented to Selective that he had made $176,794.09 in cash payments to

workers, and he submitted QuickBook invoice summaries of these payments.  *Id.*

at 0006, 0091-99.  Sela noted that "[s]ignificant additional" cash payments were made

---

[5]The Court arrives at this figure by summing the following: $5235.00 to Vassallo Fabrication and Installation, $15,499.30 to Perfect Touch Construction, $2325.00 to Northeast Sheet Metal, $2456.02 to Sheridan Sheet Metal, and $12,445.00 to Industrial Door Company.  Some of these numbers are slightly different than the ones provided in Sela's summary cover sheet.  Def. Ex. 58 at 0006.  First, Sela later clarified that about $150 of his Northeast Sheet Metal payments were for work inside the garage (unrelated to hail damage).  Def. Ex. 45 at 0001.  The Court thus deducted that amount.  Second, in the Vassallo Fabrication and Installation invoices, $100 was actually a rebate that Sela was supposed to receive (not a charge that he was supposed to pay).  ECF No. 267 at 142.  The Court thus deducted that amount.  The Court makes a couple of additional notes:

First, Sela's cover sheet represents that he paid $5335 to Vassallo Fabrication and Installation.  Def. Ex. 58 at 0006.  Sela's attached checks only amount to $3835, *id.* at 0057-59, and Sela later explained to Selective that he did not make payments for the full amount because of issues with the quality of Vassallo Fabrication and Installation's work, Def. Ex. 45 at 0001; BT Pls. Ex. 8 at 47.  But because what mattered was which post-2010 repairs were completed, and because Vassallo Fabrication and Installation verified that it completed $5235 in repairs on Sela's home, the Court includes the full $5235 in its calculation.

Second, Sela also told Selective that the garage-door replacement (by Industrial Door Company) was not part of his prior insurance claim, but rather was simply a post-2010 repair.  JT Pls. Ex. 32 at 43; Def. Ex. 45 at 0002.

"that are not reflected in these summaries, but are contained in the records of [Sela's ex-wife] Nicole Sela."  *Id.* at 0006.

Pack sent verification forms to all five businesses from whom Sela had submitted invoices, Def. Ex. 60 at 0039, and all five businesses verified that the invoices were authentic, *id.* at 0040-42, 0052-53; *see also* Def. Exs. 61, 67, 68; JT Pls. Ex. 34.  Pack did not, however, verify any of the cash payments that Sela claimed to have made to laborers. Pack was provided with the name of one laborer to whom Sela had paid cash (Antonio Rodriguez), but Sela noted that he "tried to get the contact information for Mr. Rodriguez and he's nowhere to be found."  BT Pls. Ex. 8 at 51.  Sela explained to Selective that the other laborers were "Mexican guys" who worked for various businesses that had completed the repairs for him, and he did not know how to contact them.  *Id.* at 49-55, 75-83.  Pack never attempted to find Rodriguez herself, or to ask any of the businesses whether they could provide contact information with respect to any of the laborers, or even to ask those business if, in fact, Sela had paid cash to their employees.[6]  Sela also made clear in his examination under oath that, although he believed that there were additional cash payments that were not reflected in the $176,794.09, he did not have any records relating to any such payments, and, as far as he

---

[6]Sela also told Selective that Garlock French and its workers did some repairs for him.  *Id.* at 48-49.  Pack never followed up with Garlock French.

knew, neither did Nicole Sela.  He therefore did not want to speculate further about possible additional payments.  *Id.* at 55-59.

In sum, then, Selective knew that Sela had received $510,797.23 from Lexington for the 2010 hail damage; Selective had verified about $38,000 in invoices submitted by Sela; and Selective had received Sela's statement that he had made nearly $177,000 in cash payments to workers.  Pack's singular focus became the large gap between what Lexington had paid to Sela for the damage caused by the 2010 hailstorm ($510,797.23) and what Sela claimed to have spent on repairing some of that damage (about $215,000).  *See, e.g.*, ECF No. 273 at 28, 40, 41, 63.  Pack made it her goal to prove that Sela could not possibly have spent just $215,000 to repair over $510,000 in damages.

Selective lost its way.  Selective was supposed to be conducting a fraud investigation—that is, investigating whether Sela (to quote the insurance policy) "willfully and with intent to defraud[,] concealed or misrepresented any material fact or circumstance relating to [his] insurance."  Def. Ex. 1 at 0057.  Sela never told Selective that he had managed to spend just $215,000 to repair over $510,000 in damages.  Instead, he told Selective—again and again—that he had *not* repaired much of the damage caused by the 2010 hailstorm.  Thus, Selective's fraud investigation was consumed with proving that something Sela had *not* said was false.

Sela did make representations about the repairs that he had made.  But no one at Selective focused on what Sela claimed to have repaired, estimated the cost of those repairs, and compared that estimate with Sela's reported expenditures.  Put differently, no one at Selective asked whether the repairs that Sela claimed to have made could have been done for $215,000.  Instead, Selective focused entirely on whether something that Sela never claimed to have done—repair *all* of the damage caused by the 2010 hailstorm—could have been done for $215,000.

### B.  Selective's Expert

As part of its investigation, Selective retained an expert—Collins O.Y. Ofori-Amanfo—to inspect Sela's property.  *See* Def. Ex. 80.  Ofori-Amanfo is a forensic engineer and owns his own consulting company, Collins Forensics.  ECF No. 265 at 124. Ofori-Amanfo has not received any specific training in copper or cement-tile roofs.  ECF No. 266 at 61-62.  Ofori-Amanfo spent three full days inspecting Sela's property—one day inspecting Sela's windows to determine the cause of leaks and two days inspecting the hail damage to the rest of the property.  Def. Ex. 80 at 0009; ECF No. 266 at 17. Ofori-Amanfo issued a report in August 2016.  *See* Def. Ex. 80.[7]

---

[7]Ofori-Amanfo also issued a revised report in January 2018.  ECF No. 272 at 92. But those revisions were made long after Selective denied Sela's claim and commenced this action against him.  Thus, all references to Ofori-Amanfo's "report" are references to his August 2016 report.

Ofori-Amanfo concluded that most of the damage caused by the 2010 hailstorm had not been repaired. *See* Def. Ex. 80. Most significantly, Ofori-Amanfo said that, contrary to Sela's representations, the following pieces of property had not been repaired after being damaged by the 2010 hailstorm:

- On the home, the gutters, downspouts, "barrel roof,"[8] and copper roof panels that were not attached to the stucco walls. Def. Ex. 80 at 0017.

- The gazebo's roof panels. Def. Ex. 80 at 0017.[9]

- Three patio heaters and an outdoor grill. Def. Ex. 80 at 0019.

As evidence that these items had been repaired after the 2010 hailstorm, Sela provided Selective invoices and receipts documenting such repairs, including:

---

[8]Sela uses the term "barrel roofs" to refer to curved roofs above certain windows; Ofori-Amanfo refers to those roofs as "eyebrows." ECF No. 266 at 48-49; ECF No. 267 at 57. Sela uses the term "eyebrows" to refer to the copper roof panels that were not attached to the stucco walls. ECF No. 266 at 48-49, 75. The Court uses the term "barrel roofs" in the same way as Sela. To avoid confusion, the Court will simply not use the term "eyebrows."

[9]The Court notes that there was a miscommunication between Sela and Ofori-Amanfo regarding the gazebo repairs. Ofori-Amanfo claims that Sela told him that the middle flat panels of the gazebo were not repaired, but the rafters between the flat panels were repaired. ECF No. 266 at 44, 96-97. Sela claims that he told Ofori-Amanfo just the opposite—that he repaired the middle flat panels of the gazebo but not the rafters. A witness corroborates Sela's account. ECF No. 267 at 97. Moreover, it is clear that Sela consistently told Selective that he had repaired the middle flat panels of the gazebo but not the rafters. Selective should have drawn Ofori-Amanfo's attention to his mistake, which was contradicted by the photos that Sela had submitted to Selective, *see* Def. Ex. 58 at 0105, and the statements that Sela had made to Clark, *see* JT Pls. Ex. 32 at 8, 60, 76. Selective did not do so.

- An invoice from Vassallo Fabrication and Installation dated March 21, 2013. The invoice identified the job as "take out hail dented panels and replace except at wall." Def. Ex. 58 at 0056. This invoice had been verified by owner Richard Vassallo. JT Pls. Ex. 34. Vassallo explained to Selective that he replaced Sela's copper panels except the "panels against the wall . . . because they were behind the stucco." Def. Ex. 61 at 0002. Accordingly, he "le[ft] the panels in the wall and [shined] them up a little bit, and . . . put all new panels in between those." *Id.*

- Two invoices from Sheridan Sheet Metal, one dated April 10, 2013, and the other dated April 23, 2013, both for "4" Round Corr Pipe Copper 10'L." Def. Ex. 58 at 0074, 0078. These invoices had been verified by owner Steve Mattson. Def. Ex. 60 at 0040. Mattson told Selective that the invoices were for downspouts. *Id.*

- An invoice from Sheridan Sheet Metal dated April 9, 2013, for "#42 Rivet Copper." Def. Ex. 58 at 0073. This invoice was verified by Mattson. Def. Ex. 60 at 0040. He told Selective that the invoice was for rivets which were used to install the new downspouts. *Id.*

- An invoice from Sheridan Sheet Metal dated April 11, 2013. This invoice identified the job as "measure, make, install and solder 20 oz. copper

custom box gutter to replace two damage areas." Def. Ex. 58 at 0079.  This

invoice had been verified by Mattson.  Def. Ex. 60 at 0041.  He told

Selective that it was for replacing a damaged gutter at the right corner of

Sela's garage and another gutter in the middle of the front of Sela's house.

*Id.*

- An invoice from Northeast Sheet Metal dated August 7, 2013, which

  identified the job as "furnish and install new stainless steel framing and

  top."  Def. Ex. 58 at 0063.  This invoice had been verified by owner David

  Stohlanske.  Def. Ex. 60 at 0052-53.  Stohlanske said that this invoice

  related to his installation of a new stainless steel cover on Sela's outdoor

  grill.  Def. Ex. 117 at 0001.

Sela also provided Selective with photos of his outdoor grill.  Photos taken before

the 2015 hailstorm showed no damage; photos taken after the 2015 hailstorm showed

damage.  The photos supported Sela's claim that the grill's stainless-steel cover had

been damaged in 2015, but not in 2010.  Def. Ex. 158 at 0014; *see also* Def. Ex. 3 at 0060.

In addition, Sela provided Selective with an affidavit from Stolhanske (the owner of

Northeast Sheet Metal), who swore that in 2013 Sela asked him to fix a problem with a

patio heater—a problem that was unrelated to hail damage.  Def. Ex. 117.  Stolhanske

swore that the patio heater, which he still possessed, showed no signs of hail damage.

*Id.* Sela provided Selective with photos of his three hail-damaged patio heaters—and his one undamaged patio heater (the one that Stolhanske possessed)—further supporting Sela's claim that the patio heaters had been damaged in the 2015 hailstorm, but not in the 2010 hailstorm. Def. Ex. 158 at 0012-13.

In sum, Selective had in its possession verified receipts and invoices that showed that repairs had been done on four pieces of property that Ofori-Amanfo said had not been repaired (the gutters, the downspouts, the copper-roof panels that were not attached to the stucco walls, and the outdoor grill). Selective also had a third-party affidavit and photos showing that the outdoor grill and patio heaters had not been damaged before 2015, contrary to Ofori-Amanfo's conclusions. But Selective did not share any of this evidence with Ofori-Amanfo,[10] despite the fact that Ofori-Amanfo told

---

[10]Ofori-Amanfo testified at the bench trial that he "list[ed] every document that [he] had at the time of writing" his report, ECF No. 272 at 99, and nowhere in his report are Sela's invoices or affidavits listed, *see* Def. Ex. 80 at 0006-08. Ofori-Amanfo does list "[a] sworn statement regarding interim proof of loss claiming $749,794.76 for hail damage that occurred on June 29, 2015." *Id.* at 0007. As part of Sela's "proof of loss" he submitted to Selective, he provided Selective the invoices. But while Ofori-Amanfo lists the "sworn statement" regarding Sela's proof of loss—and also the 2015 damage estimates (which were also part of Sela's proof of loss)—he does not mention the invoices. *See id.* The absence is telling. At the jury trial, when discussing documents that Ofori-Amanfo possessed at the time of his *revised* report (in January 2018), Ofori-Amanfo seemed to state that the invoices were part of a "sworn statement of interim Proof of Loss for damage that occurred *from 2010*" that he was provided. ECF No. 266 at 89-90 (emphasis added). The Court does not know if "2010" was simply a misstatement, or if this is, in fact, referring to something different from the "sworn statement regarding interim proof of loss claiming $749,794.76 for hail damage that

(continued...)

Selective "that what could have changed his opinion would have been if Sela produced some evidence from some company to show work done or replacements made."  Def. Ex. 60 at 0062-63.

In other words, Selective hired Ofori-Amonfo to identify the extent to which Sela's property had been damaged in the 2010 hailstorm and not repaired before the 2015 hailstorm.  But then Selective failed to give Ofori-Amonfo critical evidence in its possession relevant to the very issue that he had been hired to investigate.  Even after Ofori-Amanfo told Selective that he might change his opinion if there was any evidence that an item that he had identified as unrepaired had in fact been repaired, Selective did not tell him that it possessed precisely that type of evidence.  ECF No. 272 at 89-90.  To make matters worse, Clark and Pack did not even read Ofori-Amonfo's report.  *See* ECF

---

[10](...continued)
occurred on June 29, 2015 " listed in Ofori-Amanfo's original report.

Regardless, even assuming that Ofori-Amanfo had the invoices prior to issuing his original report, he admittedly did not look at them.  *See* ECF No. 272 at 100-01 (Q: "And if there were invoices from Rich Vassallo where he showed work done on Mr. Sela's house, those aren't listed in your report either, are they?"  A: "No, they are not in this report."  Q: "And whether or not they were provided to you before you issued your report, they weren't considered by you, were they?"  A: "No."  Q: "No, they were not?"  A: "No.  I didn't have that information to—to—"  Q: "Did you not have it or did you not consider it?"  A: "I did not rely on that information for my report."  Q: "So whether you had it or not, you didn't look at it?  It didn't form any basis for your report whatsoever?"  A: "That is correct.  Yes.").

No. 273 at 73.[11]  In short, although Selective hired an expert, Selective withheld critical

information from him (information that he himself indicated he needed to produce an

accurate report), and then the fraud investigator and adjuster assigned to the claim did

not even bother to read his report.

### C.  Selective's Denial of Sela's Claim

A couple of weeks after Ofori-Amanfo issued his report, the attorney whom

Selective had hired to advise it about Sela's claim (Kristi Brownson) advised Selective

that it could deny Sela's claim under the fraud exclusion of his policy, as Sela "told us in

his [examination under oath] that all the damages from [the] prior storm were repaired

and [Ofori-Amanfo's] report says differently."  Def. Ex. 60 at 0060.  This was not true; as

the Court has explained, Sela never told Selective—during his examination under oath

or at any other time—that he had repaired all of the damage from the prior storm.[12]  To

---

[11]Pack does not recall even receiving the report, ECF No. 273 at 58-59, and her
SIU file does not show that she ever got a copy, *see* Def. Ex. 60 at 0060-63.  Similarly,
there is no evidence that Clark received a copy of Ofori-Amanfo's report.  BT Pls. Ex. 10
at 0002-04.

[12]Selective (now) contends that there were three occasions on which Sela
represented that all of the damage caused by the 2010 hailstorm had been repaired and
that Selective relied on these representations:

First, Sela allegedly told Bryan Walton "that the entire exterior of [the] dwelling
was redone approximately 3 years ago."  BT Pls. Ex. 2. at 0001.  But, as the Court will
explain below, no one at Selective who made the decision to deny Sela's claim was even
aware of this statement, and a reasonable insurer would not have relied on it.

(continued...)

the contrary, Sela consistently told Selective that he had *not* repaired all of the damage

from the prior storm.  Several Selective employees were aware of that fact, and yet, as

far as the record reflects, not one of them corrected Brownson.

---

[12](...continued)

Second, Sela responded to Clark's question about whether "all the gutters and everything were replaced," by saying "[o]h, yeah, everything was done, replaced. Copper.  See what they had to do—we had to take, like, a foot and a half from around the house, the edge, because all the flashing goes right into the tile system."  JT Pls. Ex. 31 at 18.  (Multiple times during the same conversation, Sela also told Clark that he had not repaired all of the damage from the 2010 hailstorm.)  As the Court will explain below, no reasonable insurer would have relied on this statement—and, in fact, none of the decision makers at Selective did, as the only person at Selective who was even aware of this statement was Clark, and he forgot about it until after this lawsuit was commenced and Sela produced a recording of his conversation with Clark.

And third, Sela provided Selective a report from a company called "Vericlaim." The Vericlaim report was commissioned by Lexington to document Sela's post-2010 repairs.  Selective contends that, in providing the Vericlaim report to Selective, Sela represented that all of the 2010 damage had been repaired—citing text found next to photos in the report stating (for example) that various items "ha[ve] been repaired" or "ha[ve] all been replaced."  *See* BT Pls. Ex. 5.  But Sela made clear before he submitted the Vericlaim report to Selective that the report was not accurate and that he had not completed all of the repairs identified by the report.  JT Pls. Ex. 31 at 4-5; JT Pls. Ex. 32 at 4; Def. Ex. 49.  It should go without saying that no reasonable insurer would rely on the statements in the Vericlaim report that Sela had disclaimed—and, in fact, as the Court will explain below, none of the decision makers at Selective did so.

There is a reason why the jury quickly determined that Sela had not committed fraud.  No reasonable insurer would have relied on any of these statements to conclude that Sela had falsely represented that all of the damage caused by the 2010 hailstorm had been repaired.  And, in fact, no one at Selective *did* rely on these statements in deciding to deny coverage to Selective.  These statements became prominent only much later when, months after suing Sela, Selective's attorneys began casting about for evidence of misrepresentations.

A couple of months later, Brownson sent an email formally recommending that Selective deny Sela's claim on grounds of fraud.  Def. Ex. 60 at 0062.  Clark, Pack, and Pack's supervisor (Terry Steele) all approved Brownson's recommendation.  *Id.*  Pack and Clark then noted in their files that Brownson was proceeding with the filing of this declaratory-judgment action.  *Id.* at 0063; BT Pls. Ex. 10 at 0002.  Selective never bothered to tell Sela that it had decided to deny his claim; instead, Sela learned of Selective's decision when he was served with the complaint in this declaratory-judgment action.

Throughout this declaratory-judgment action, Selective has struggled mightily to identify a single "material fact or circumstance" that Sela allegedly misrepresented, despite being ordered by the Court to do so.  Def. Ex. 1 at 0057.  Selective has also struggled mightily to identify the person at Selective who decided that Sela should be denied coverage because he had misrepresented a "material fact or circumstance."  This latter point warrants some elaboration.

As this Court explained in an earlier order:

> One bizarre aspect of the case is that, from the beginning of the litigation, Selective has been unwilling to identify the person who made the decision to deny coverage to Sela.  Typically, when an insured files a claim, the claim is assigned to an adjuster, the adjuster does an investigation, the adjuster makes a decision (sometimes seeking the approval of a supervisor), and the adjuster notifies the insured of the decision.  If litigation commences, the insurer

> promptly identifies the decision maker (whose identity is
> generally known to the insured anyway), and the insurer
> produces the decision maker's file.  It would not even occur
> to an insurer to try to hide the identity of the decision maker.
> That information is obviously highly relevant and not
> privileged—and, if the insurer is confident that it acted
> lawfully, the insurer should be eager for the decision maker
> to be given an opportunity to explain and defend his or her
> decision.

ECF No. 193 at 2.

As is clear from the Court's description of the facts—and as is even clearer from

Selective's files—Brownson, Pack, and Clark have their fingerprints all over the decision

to deny coverage to Sela.  Pack was the SIU investigator and Clark was the adjuster

assigned to the claim.  Pack and Clark are the individuals at Selective who appear most

frequently in the claim notes and SIU file; they are the ones joining Brownson on

conference calls to discuss Sela's claim; and they are the ones responding to Brownson's

emails about Sela's claim.

Curiously, however, both Pack and Clark have steadfastly denied that they made

the decision to deny Sela's claim.  *See, e.g.*, ECF No. 273 at 42; ECF No. 265 at 100.  In

fact, Pack and Clark have gone even further.  Both Pack and Clark have made the rather

incredible assertion that they did not even *express an opinion* about whether Sela's claim

should be denied on the basis of fraud.  *See, e.g.*, ECF No. 273 at 42 (Pack testifying that

while Selective brought a lawsuit, that was "not [her] decision," and, in fact, she does

not recall even communicating a recommendation regarding whether Sela's claim should be paid or not); ECF No. 265 at 72 (Clark testifying that he does not do fraud investigations, so he does not "make a determination" on whether there is fraud or not).

For reasons that escape the Court, Sela never took Brownson's deposition.  But in her appearances before this Court, Brownson also denied making the decision to deny coverage to Sela.  So who made that decision, if not Pack, Clark, or Brownson?  Selective's attorneys have given the Court three different answers (at least two of which are necessarily wrong):

First, at the hearing on the summary-judgment motion, the Court asked Brownson who made the decision to deny coverage to Sela.  Brownson tried to duck the question.  After being pressed by the Court, however, Brownson finally identified the decision maker as "Wade Christian."

Second, at the pretrial conference immediately prior to the jury trial, the Court expressed puzzlement that Christian did not appear on either party's witness list.  In response, Joseph Lulic—an attorney for Selective who, unlike Brownson, had not worked with Selective on the claim at the time it was investigated and denied—informed the Court that Brownson was wrong, and that Christian had not made the decision to deny coverage to Sela.  Instead, said Lulic, a "committee of people" had made that decision—people whom Lulic refused to name.

And third, after the jury trial concluded with a verdict against Selective, the Court scheduled a bench trial on Sela's bad-faith counterclaim.  At that bench trial, of course, the Court would have to decide whether the person who made the decision to deny Sela's claim had acted in bad faith.  The Court asked Selective to identify the decision maker so that the Court could better review the record in preparation for trial, and so that the Court could fulfill its duty to enforce the Minnesota Rules of Professional Conduct.  *See* D. Minn. LR 83.6.  Those rules provide that, with few exceptions, "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness."  Minn. R. Prof'l Conduct 3.7(a).  After presiding over the case for almost three years, the Court believed that it was possible—even likely—that Brownson made the decision to deny coverage to Sela.  If Brownson was the decision maker, then she would not be able to act as an advocate at the bad-faith trial.  Minn. R. Prof'l Conduct 3.7(a).  The Court thus sent Selective's attorneys a letter asking them to identify who made the decision to deny coverage to Sela on the basis of fraud.  ECF No. 187 at 1.

In response, Selective refused the Court's request and said that it would not identify the decision maker.  ECF No. 191.  The Court then had to take the time to draft a lengthy order explaining to Selective why it wanted to know who made the decision to deny coverage to Sela.  *See* ECF No. 193.  The Court ordered Selective to identify that

person and warned that, if Selective failed to so do, the Court would schedule a hearing and order Selective to show cause why it should not be held in contempt. *Id.* at 11. Selective relented and filed an affidavit identifying "Carl Walton" (Clark's supervisor) as the individual at Selective who made the decision to deny Sela's claim on the basis of fraud.

Having reviewed the record and presided over both the jury trial on fraud and the bench trial on bad faith, the Court does not credit Selective's assertion that Walton made the decision to deny Sela's claim. Instead, the Court finds it likely that the second of Selective's three conflicting answers—that the decision was made by a "committee of people"—is true. That committee probably did not even include Walton; instead, the committee was likely composed of Clark, Pack, and Pack's supervisor (Steele).

To elaborate: Selective's files show that Walton's involvement in the case was extremely limited—amounting to little more than reviewing the claims file every few months and "monitor[ing it] for [a] resolution." *See* BT Pls. Ex. 10. At one point in the file, Walton instructed Clark to "continue to work with [the] SIU in resolving this one." *Id.* at 0004. The file indicates that Walton did not intend to "resolv[e]" the claim himself; instead, he intended to sign off on whatever Clark and the SIU decided. And that is what he seems to have done.

On November 16, 2016, Brownson sent an email to various individuals at Selective recommending that the company proceed with the filing of a declaratory-judgment action against Sela.  Def. Ex. 60 at 0062.  Clark responded that same day, agreeing with Brownson's recommendation, but noting that the SIU (which does not include Walton) will have to weigh in.  *Id.*; BT Pls. Ex. 10 at 0002-03.  Pack and Steele (both of whom work in the SIU) responded the next day (November 17, 2016), and both agreed with Brownson's recommendation.  Def. Ex. 60 at 0062.  Pack entered a note that same day stating that "Brownson will be filing [a declaratory-judgment] action."  *Id.* at 0063.  Clark updated his notes a couple of weeks later (on November 28, 2016), stating that "[c]overage counsel is in the process of filing a [declaratory-judgment action]."  BT Pls. Ex. 10 at 0002.  In other words, it is clear that by November 17, the decision to deny Sela's claim and file a declaratory-judgment action had been made.  And yet Walton's name does not appear in Selective's files during this time period.  There is no indication that Walton played any role in the November 16-17 discussions, nor any indication that he had further involvement with the file until December 1, 2016—several days after Clark had written that Brownson was "in the process of filing a [declaratory judgment action]."  *Id.*  On December 1, Walton merely noted that Selective needed advice on whether it had to issue a formal denial before the declaratory-

judgment action was filed (as opposed to letting the filing of the declaratory-judgment

action serve as the denial).  BT Pls. Ex. 10 at 0002.

For these reasons, the Court does not credit Walton's eleventh-hour attempt to

take the fall for the Selective employees who actually made the decision to deny Sela's

claim.  Indeed, it appears to the Court that Selective may have identified Walton as the

decision maker—after earlier identifying "Wade Christian" and then "a committee of

people"—precisely because he had so little involvement in the case that he would be

more difficult to impeach than Brownson, Pack, and Clark.

## II.  CONCLUSIONS OF LAW[13]

The question before the Court is whether Selective acted in bad faith in denying

insurance benefits to Sela, thus entitling Sela to recovery of "taxable costs" under Minn.

Stat. § 604.18.  The Court first explains why it finds that Selective acted in bad faith.  The

Court next identifies the "taxable costs" that Sela is entitled to recover.  And finally, the

Court addresses a dispute between the parties regarding prejudgment interest.

---

[13]Labeling the Court's conclusions as "Conclusions of Law" is a bit of a
misnomer, as the two main issues that the Court must address under Minnesota's bad-
faith statute—one regarding reasonableness, and the other regarding recklessness—are
actually issues of fact. *See* Minn. Stat. § 604.18, subds. 2(a)(1) & 2(a)(2).

*A.  Bad Faith*

In Minnesota, an insured such as Sela can recover "taxable costs" from his insurer under the bad-faith statute when the insured establishes both:

(1)    the absence of a reasonable basis for denying the benefits of the insurance policy; and

(2)    that the insurer knew of the lack of a reasonable basis for denying the benefits of the insurance policy or acted in reckless disregard of the lack of a reasonable basis for denying the benefits of the insurance policy.

Minn. Stat. § 604.18, subd. 2(a).[14]

---

[14]Selective argues that Sela cannot recover under the bad-faith statute because his insurance claim was "resolved or confirmed by arbitration or appraisal." *See* ECF No. 239; *see also* Minn. Stat. § 604.18, subd. 4(c) (stating that "[a]n award of taxable costs under this section is not available in any claim that is resolved or confirmed by arbitration or appraisal"). Selective is incorrect.

On December 12, 2016—10 days after Selective filed this lawsuit—Sela demanded that Selective agree to appraisal of his insurance claim *and Selective refused*. *See* ECF No. 37 at ¶ 66; ECF No. 38 at ¶ 24. Sela later sought to bring a bad-faith claim against Selective based on Selective's refusal to resolve his insurance claim through appraisal. ECF No. 68-1 at ¶¶ 77-78. This Court agreed with Selective that it had acted properly in refusing to resolve Sela's insurance claim through appraisal:

> Appraisal is a means for resolving factual disputes over the *amount* of a loss. Appraisal is not a means for resolving legal disputes over whether an insurer must *cover* a loss. . . .

> Selective was not required to submit this dispute to a panel of appraisers. The dispute between Selective and Sela is not a dispute over "the amount of loss," such as a dispute

(continued...)

The first prong is objective and asks whether a reasonable insurer would have denied benefits under the circumstances. *Friedberg v. Chubb & Son, Inc.*, 800 F. Supp. 2d 1020, 1025 (D. Minn. 2011). The second prong is subjective and asks whether the particular insurer denied benefits while knowing of, or acting in reckless disregard of, the lack of a reasonable basis. *Id.*

---

[14](...continued)

> over how much it would cost to replace the roof on Sela's home. Rather, the dispute between Selective and Sela is a dispute over whether Selective has any obligation to indemnify Sela *regardless* of "the amount of loss." This is a coverage dispute . . . .

> . . . [W]hat Selective and Sela dispute is whether there is *any* coverage, and coverage disputes cannot be resolved by appraisers. . . . That includes disputes over whether the insured has forfeited all coverage by engaging in some kind of fraud.

*Selective Ins. Co. of S. Carolina v. Sela*, 353 F. Supp. 3d 847, 864–65 (D. Minn. 2018).

Sela's entitlement to be indemnified turned entirely on the question of whether he had forfeited coverage by committing fraud. That question was resolved by the jury; no appraiser ever considered it. Instead, after the jury resolved the dispute over Sela's entitlement to indemnification, a panel of appraisers assigned a dollar value to Sela's claim pursuant to an agreement reached by the parties during trial (and not because either party had agreed to a demand for appraisal under the provisions of the policy).

1.  First Prong: Objective

a.  *Legal Standard*

As noted, the first prong of Minnesota's bad-faith statue is objective and asks whether the insurer had a reasonable basis to deny benefits under the circumstances of the particular case.  In applying the objective prong, a court must "consider whether the claim was properly investigated and whether the results of the investigation were subjected to reasonable evaluation and review."  *Friedberg*, 800 F. Supp. 2d at 1025; *see also Darmer v. State Farm Fire & Cas. Co.*, ___ F. Supp. 3d ___, No. 17-CV-4309 (JRT/KMM), 2020 WL 514261, at *10 (D. Minn. Jan. 31, 2020); *Borchardt v. State Farm Fire & Cas. Co.*, No. 16-CV-0055 (PJS/KMM), 2017 WL 8315883, at *3 (D. Minn. Apr. 26, 2017). Whether the insurer "acted reasonably in good or bad faith is measured against what another reasonable insurer would have done in a similar situation."  *Friedberg*, 800 F. Supp. 2d at 1025 (citation omitted).  Expert testimony regarding what another reasonable insurer would have done is not necessary unless the issue "'is so esoteric that jurors of common knowledge and experience cannot form a valid judgment as to whether the conduct . . . was reasonable.'"  *Roettger v. United Hosps. of St. Paul, Inc.*, 380 N.W.2d 856, 860 (Minn. Ct. App. 1986) (citation omitted); *see also* New Appleman Insurance Law Practice Guide § 6.10 (2019 ed.) (explaining that "[e]xpert testimony is not required where the reasonableness (or lack of it) of the insurer's conduct is

something that is within the understanding of the average juror and does not require specialized knowledge or skill to understand").[15]

After careful consideration, the Court finds that Selective did not have a reasonable basis to deny benefits to Sela on the basis of fraud.

---

[15]Assessing the reasonableness of Selective's investigation and its denial of Sela's claim is certainly not "so esoteric" that the Court needs the assistance of an expert witness. *See, e.g., DeChant v. Monarch Life Ins. Co.*, 547 N.W.2d 592, 594, 599-600 (Wis. 1996) (bad-faith claim alleging that an insurer improperly reclassified a totally-disabled insured as only residually disabled was "well within the jury's ordinary experience" to understand and did not require an insurance-industry expert); *Weiss v. United Fire & Cas. Co.*, 541 N.W.2d 753, 759-60 (Wis. 1995) (bad-faith claim alleging that an insurer's "incomplete and slipshod investigation of the claim prevented it from learning the true facts" was one that "the average juror might readily determine, without the benefit of expert testimony"); *Dregne v. W. Bend Mut. Ins. Co.*, No. 97-1284, 1998 WL 30157, at *2 (Wis. Ct. App. Jan. 29, 1998) (bad-faith claim alleging that an insurer acted unreasonably in considering the insured's submitted evidence by "fail[ing] to share" that evidence "with the appraiser on whose opinion [it] relied" and "fail[ing] to investigate further based on" that evidence was not so complex as to require expert testimony); *Tholl v. State Farm Fire & Cas. Co.*, No. 84-2141, 1985 Wisc. App. LEXIS 3946, at *11 (Wis. Ct. App. Dec. 4, 1985) ("Certainly, a jury could determine without expert testimony whether an insurer's investigation of a claim was neutral and detailed, and whether the claim was fairly evaluated before payment was denied."); *see also Tengvall v. Stuart Corp.*, No. CX-97-80, 1997 WL 360906, at *2 (Minn. Ct. App. July 1, 1997) (holding that expert testimony regarding apartment-managers' standard of care was not necessary, because "[a]partment managers are professionals in a field to which many lay persons have had exposure, and the public understands the general nature of an apartment manager's responsibilities").

b. *Selective's Denial*

i.  Selective's Fraud Investigation

Selective denied Sela's claim under the fraud provision of its policy, which precludes coverage to an insured who "willfully and with intent to defraud[,] concealed or misrepresented any material fact or circumstance relating to [his] insurance." Def. Ex. 1 at 0057.  Specifically, Selective alleged that Sela lied by claiming that, after the 2010 hailstorm, he made repairs that he had not made.

In deciding whether an insured committed fraud, nothing is more important than identifying the words that the insured spoke or wrote.  After all, the essence of fraud is a *lie*—a false statement made by an insured.  Yet prior to concluding that Sela had lied about the repairs that he had made to his home following the 2010 hailstorm, no one at Selective (1) identified what Sela had actually said and (2) investigated whether what Sela had actually said was true.  Indeed, Pack—who led the fraud investigation— admitted that she *did not care* "what Mr. Sela may or may not have told people."  ECF No. 273 at 53.  Instead, Pack wanted Sela to "prove that the previous work was done"—i.e., that he had repaired all of the damage caused by the 2010 hailstorm.  *Id.*  There were a couple of glaring problems with Pack's approach:

First, Sela did not have to prove to Selective that any previous work had been done.  Rather, Sela needed only to show that he had sustained a loss as a result of the

2015 hailstorm.  Prior to denying Sela's claim, no Selective employee ever suggested that Sela had not sustained a loss from the severe hailstorm that pounded his home on June 29, 2015; to the contrary, Clark characterized Sela's loss as "significant."  ECF No. 272 at 80.  Sela also needed to cooperate with Selective's investigation, which he did.  And finally, Sela needed to not lie.  Thus, the only "previous work" that Sela had to "prove . . . was done" was the previous work that Sela *said* had been done.[16]

Second, to identify what previous work Sela said had been done, Pack would have had to focus on the very thing that she said did not matter to her:  "what Mr. Sela may or may not have told people."  ECF No. 273 at 53.  True to her word, Pack ignored much of what Sela said.  For example, although Sela submitted to Pack photos on which he identified what he had not repaired following the 2010 hailstorm, Pack's file notes dismiss these photos as "a few photos with 'no' written on them and arrows pointing to section[s] of house.'"  Def. Ex. 60 at 0035.  These photos were some of the most critical evidence that Pack had regarding what Sela claimed to have repaired, and yet it appears that she paid little attention to them.

Moreover, Pack did not try to understand the nature of the repairs that Sela claimed to have made.  For example, upon being shown a receipt for painting supplies that Sela had submitted, Pack claimed that the receipt did "not appear to be related to a

---

[16]In fact, Sela did not need to "prove" this much; the burden of proof was on Selective to show that the fraud exclusion applied.

roof claim." ECF No. 273 at 31. When asked "if the gazebo was sanded, refinished, and painted" to repair damage from the 2010 hailstorm, Pack responded, "I do not know. That's not the focus of my investigation." *Id.*

As the Court has already explained, the "focus of [Pack's] investigation" was the large gap between the amount of money that Lexington had paid to Sela ($510,797.23) and the amount of money that Sela claimed to have paid to repair damage caused by the 2010 hailstorm (about $215,000). *See, e.g.*, ECF No. 273 at 28, 40, 41, 63. Pack clearly thought it impossible that Sela could have spent only $215,000 to repair over a half million dollars in damage. But Pack missed the crucial point that *Sela was not claiming to have repaired everything.*[17] And if Pack had paid attention to what Sela actually told

---

[17]As previously noted, Selective now contends that Sela represented that he repaired all of the damage caused by the 2010 hailstorm and that his representation was material—that is, something that would "matter to a reasonable insurer." *Borchardt v. State Farm Fire & Cas. Co.*, 931 F.3d 781, 786 (8th Cir. 2019). But a reasonable insurer would not have relied on any of the statements cited by Selective.

First, Selective points to Bryan Walton's report, which asserts that Sela said "that the entire exterior of [the] dwelling was redone approximately 3 years ago." BT Pls. Ex. 2. at 0001. But in the months following Walton's initial inspection, Sela consistently told everyone with whom he communicated at Selective that he had not repaired all of the damage caused by the 2010 hailstorm. Given that Selective's files were bulging with documents in which Sela made clear that he had not repaired all of the 2010 damage, no reasonable insurer would have relied on one sentence in Walton's brief report— especially without talking to Walton (which no one at Selective did, ECF No. 265 at 19-20) or asking Sela about his conversation with Walton (which no one at Selective appears to have done).

(continued...)

Selective, she would have heard Sela explain not only that he did not repair much of the 2010 damage, but also that the repairs that he chose to forego were among the most costly.  In other words, Sela went forward with the cheaper repairs and did not go forward with the more expensive repairs.

For example, Sela explained that he repaired only the "middle parts" of the gazebo roof panels, and not the ridges or cap of the gazebo, as "it was too expensive and too crazy to build it."  JT Pls. Ex. 32 at 76.  He added that he "did not touch the windows . . . because of the complexity," explaining that he would have had "to take all the stone around the windows apart."  *Id.* at 7.  Sela also made clear that, on the main

---

[17](...continued)

Second, Selective points to Sela's response to Clark's question of whether "all the gutters and everything were replaced."  JT Pls. Ex. 31 at 18.  Sela's response was, "Oh, yeah, everything was done, replaced.  Copper.  See what they had to do—we had to take, like, a foot and a half from around the house, the edge, because all the flashing goes right into the tile system."  *Id.*  But, for a couple of reasons, a reasonable insurer would not have relied on this as an assertion that all *copper* parts of the house had been repaired, much less as an assertion that all *parts* of the house had been repaired.  First, Sela's discussion of the flashing shows that he is talking about gutter repairs (which led to damaged flashing, *see, e.g.*, Def. Ex. 3 at 0040).  Second, in the very same conversation, Sela pointed out to Clark various pieces of copper (and other damaged items) that had not been replaced.

Finally, Selective points to a Vericlaim report submitted by Sela which notes that various pieces of Sela's property "ha[ve] been repaired" or "ha[ve] all been replaced."  *See* BT Pls. Ex. 5.  But Sela made clear before he submitted the Vericlaim report to Selective that it was not accurate.  JT Pls. Ex. 31 at 4-5; JT Pls. Ex. 32 at 4; Def. Ex. 49.  Accordingly, no reasonable insurer would have relied on the Vericlaim report in finding that Sela had committed fraud.

house, he replaced only the copper roof panels below the balcony, as fixing the other

copper roof panels would have required removing the stucco.  Def. Ex. 58 at 0102; Def.

Ex. 80 at 0008.

Moreover, even with respect to the repairs that Sela made, he tried to do them on

the cheap.  Sela hired companies whose owners he knew, he paid laborers cash because

it led to "much better prices," and he chose to repair (rather than replace) some of the

property.  For example, instead of paying for new copper gutters, Sela removed,

"heated, rolled and reinstalled" the damaged gutters.  Def. Ex. 80 at 0008-09.

In sum, before denying Sela's claim on the ground that he had lied about what

repairs he had made after the 2010 hailstorm, no one at Selective identified (1) what,

exactly, Sela said about those repairs and (2) whether what Sela said was true.  And

even though Pack focused obsessively on the gap between the $510,797.23 that

Lexington had paid to Sela and the $215,000 that Sela claimed to have spent, neither

Pack nor anyone else ever made a list of all of Sela's claimed repairs, estimated the

likely cost of those repairs, and then determined whether Sela could plausibly have

spent only $215,000 on those repairs.[18]

---

[18]To give a very rough example of the kind of calculus that Selective could have
made:  One of the first documents that Sela provided to Pack was an estimate that the
replacement cost of repairing or replacing all of the property damaged in the 2010
hailstorm was $618,584.98.  *See* Def. Ex. 49 at 0002.  If you sum the amounts attributed to
damage that was not repaired (chimney caps, windows, snow guards), damage that
(continued...)

ii. Selective's Reliance on Ofori-Amanfo

Selective's retention of Ofori-Amanfo did not make matters any better, as Ofori-Amanfo was not truly independent, as Selective did not ensure that he reviewed all of the relevant evidence, and as Selective did not reasonably review and rely on his work.

Before Ofori-Amanfo inspected Sela's property, Brownson provided him with a copy of the anonymous letter. Def. Ex. 130. The anonymous letter included information that was highly prejudicial to Sela and either irrelevant to Ofori-Amanfo's work (such as information about Sela's prior felony convictions) or false (such as allegations that Sela had instructed workers to intentionally damage his own property). Providing the anonymous letter to Ofori-Amanfo had the predictable impact on him. He responded: "YAK!!!!  The anonymous information is truly damaging!"  Def. Ex. 130. In other words, Selective led Ofori-Amanfo to believe that Sela was a "convicted felon"

---

[18](...continued)
was mostly not repaired (gazebo, pool-house skylights), damage that was repaired but not replaced (gutters on the main house and pool house), and half of the damage to the copper standing-seam roof panels (because the panels attached to the stucco walls were not repaired), the replacement costs would total about $359,640.84. *See id.*; *see also* JT Pls. Ex. 19. (This does not reflect the fact that some of the vents were not replaced. Def. Ex. 58 at 0001.) Subtracting $359,640.84 from the total replacement-cost estimate of $618,584.98 leaves a replacement-cost estimate of $258,944.14. The gap between $258,944.14 and Sela's claimed expenses of slightly above $200,000 (deducting for the garage door, which was not included in the 2010 repair estimates) looks much less suspicious than the gap between "half a million dollars" and $200,000, especially recognizing the leverage that Sela had as the result of his contacts in the industry and his ability to pay cash.

who made a "cash flow machine" out of intentionally damaging his own property and filing fraudulent insurance claims.  Def. Ex. 98 at 0001.

Worse still, Selective did not provide Ofori-Amanfo with evidence that was both relevant to his work and favorable to Sela.  Ofori-Amanfo's report states at one point that "receipts were not made available to describe the specific repair that was performed by the homeowner."  Def. Ex. 80 at 0008.  The report also lists all of the documents that Selective gave to Ofori-Amanfo, and notably absent from the list are the invoices documenting the post-2010 repairs.  *Id.* at 0006-08.  There is simply no excuse for Selective withholding this evidence from its expert.  *See* New Appleman on Insurance Law Library Edition § 55.04[2][b][ii] (2018) ("An insurer cannot rely on an expert opinion where the insurer has failed to provide the expert with important information in its possession.").

Having been given irrelevant and untrue information that was harmful to Sela, and having been deprived of relevant and true information that was favorable to Sela, Ofori-Amanfo concluded that most of Sela's property had not been repaired after the 2010 hailstorm.  After issuing his report, though, Ofori-Amanfo told Selective "that what could have changed his opinion would have been if Sela produced some evidence from some company to show work done or replacements made."  Def. Ex. 60 at 0063.  Selective still did not tell Ofori-Amanfo that it had evidence of such repairs in its files.

In his report, Ofori-Amanfo opined that the copper downspouts and gutters had not been repaired after the 2010 hailstorm. Def. Ex. 80 at 0017. He based his opinion in large part on his analysis of the pattern of the dents that he found. *Id.* at 0010, 0017. After later being given the invoices from Sheridan Sheet Metal, however, Ofori-Amanfo changed his opinion and conceded that Sela had replaced some of the downspouts and gutters after the 2010 hailstorm. ECF No. 266 at 71, 81, 83, 86.

Similarly, Ofori-Amanfo opined that Sela's outdoor grill and patio heaters had not been repaired after the 2010 hailstorm. Once again, he based his opinion on his analysis of the pattern of dents on these items. Def. Ex. 80 at 0019. And once again, he was wrong. Sela had submitted evidence to Selective showing that the damage to the patio heaters and grill was from 2015—as the patio heaters were in storage during the 2010 hailstorm, and as the grill received a new stainless-steel cover in 2013.

Selective's failure to provide relevant information to Ofori-Amanfo thus had significant consequences. It contributed to him forming incorrect opinions about specific items, such as the downspouts, gutters, grill, and patio heaters. More importantly, though, it kept him from realizing that the dent analysis on which he relied in concluding that other items had not been repaired (such as the single-pitched copper roof panels, *see* Def. Ex. 80 at 0009, and the roof panels on the gazebo, *see id.* at 0015) was unreliable.

In short, Ofori-Amanfo's report was riddled with errors and was based in part on a method of analysis that was clearly unreliable.  But Selective did not care whether Ofori-Amanfo's report provided a basis for denying Sela's claim.  No decision maker at Selective bothered to *read* the report—and thus no one seemed to notice that many of the report's conclusions were contradicted by the verified invoices sitting in Selective's own files.  *See* New Appleman on Insurance Law Library Edition § 55.04[2][b][ii] (2018) ("Even having retained a properly qualified expert, an insurer may not blindly rely on the opinion rendered.  If the opinion rendered is facially incomplete or fails to take account of obviously relevant information, then even a non-expert may be in a position to recognize that it is unworthy of reliance.").

### iii.  Conclusion

Applying the objective prong of Minnesota's bad-faith statute, the Court finds that Sela has established "the absence of a reasonable basis for denying the benefits of the insurance policy."  Minn. Stat. § 604.18, subd. 2(a).

Selective denied Sela's claim on the basis of fraud.  Yet Selective never took the time to identify exactly what Sela said and to determine whether it was true.  Instead, Selective became fixated on trying to prove that Sela could not have spent only $215,000 to repair over $500,000 in damage caused by the 2010 hailstorm.  But Sela never claimed that he had repaired all of the damage caused by the 2010 hailstorm.  Sela claimed that

he had repaired *some* of the damage caused by the 2010 hailstorm—and he explained what he had done.

Ofori-Amanfo found that Sela had not repaired some of the damage that he claimed to have repaired. But no reasonable insurer would have relied on Ofori-Amanfo's conclusions, given that he was poisoned against Sela from the start, his attention was not called to information that he said he needed to reach accurate conclusions, and his method of analyzing the pattern of dents was shown to be unreliable. Instead of reasonably evaluating Ofori-Amanfo's report, neither Pack nor Clark—the two Selective employees who were in charge of handling Sela's claim—even bothered to read it. Selective's investigation and evaluation of Sela's claim fell far below the investigation and evaluation that would have been done by a reasonable insurer, leaving Selective without a reasonable basis for concluding that Sela committed fraud.

### 2.  Second Prong: Subjective

#### a.  Legal Standard

As noted, the second prong of Minnesota's bad-faith statute is subjective and asks whether the insurer denied benefits while knowing of, or acting in reckless disregard of, the lack of a reasonable basis for doing so. Minn. Stat. § 604.18,

subd. 2(a)(2).[19]  "Knowledge of the lack of a reasonable basis may be inferred and imputed to an insurer where there is reckless indifference to facts or proofs submitted by the insured."  *Friedberg*, 800 F. Supp. 2d at 1025.  After careful consideration, the Court finds that Selective acted with reckless disregard of the lack of a reasonable basis for denying Sela's claim.

---

[19]Courts have consistently referred to the second prong as "subjective," but this may be a misnomer.  The second prong incorporates a reckless-disregard standard, and "the common law has generally understood" reckless disregard "in the sphere of civil liability" to include "conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known *or so obvious that it should be known*.'"  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007) (emphasis added; citation omitted).

It is unclear whether the Minnesota legislature intended to adopt this objective reckless-disregard standard or instead intended to adopt the higher standard (often found in the criminal law) of "'*conscious[] disregar[d]*' [of] a substantial risk of serious harm."  *Farmer v. Brennan*, 511 U.S. 825, 839 (1994) (citing Model Penal Code § 2.02(2)(c) (emphasis added)); *compare In re M.J.S.*, No. C3-00-76, 2000 WL 1015886, at *1 (Minn. Ct. App. July 25, 2000) (analyzing a Minnesota statute criminalizing communicating terroristic threats and concluding that "[r]eckless disregard require[s] an actual, conscious disregard of the risk even though not having the specific purpose of terrorizing posed by one's conduct" (citation omitted)), *with Huygen v. Plums Enters. of St. Paul, Inc.*, 355 N.W.2d 149, 155 (Minn. Ct. App. 1984) (explaining that Minnesota common law allowed a civil punitive-damages award if a defendant acted with "a *conscious or reckless* disregard of another's rights" (emphasis added; citation omitted)).  Because Selective's conduct meets even the conscious-disregard standard, the Court need not decide the issue.

*b. Selective's Denial*

Clark and Pack were the two main decision makers at Selective.  After Brownson

sent an email to them in November 2016 recommending that Sela's claim be denied and

a declaratory-judgment action be filed against him, both Clark and Pack agreed with

Brownson, as did Pack's supervisor (Steele).  Def. Ex. 60 at 0062.  Clark was the first to

agree that Sela's claim should be denied on the basis of fraud.  *Id.*  But Clark had

virtually no basis—much less a reasonable basis—for his decision.  Clark had done

nothing himself to investigate Sela's alleged fraud.  *See, e.g.*, ECF No. 265 at 68 (Q: "And

just so we're perfectly clear, Mr. Clark, you didn't do any investigation of fraud in this

case at all, did you?"  A: "No.  It's not my job."); *see also id.* at 72; ECF No. 272 at 78.

Clark had not discussed Sela's alleged fraud with anyone at Selective.  *See, e.g.* , ECF

No. 265 at 100 (Q: "You haven't had any discussions with anybody at Selective about

what fraud has or hasn't been committed here, have you?  A: "No."); *see also id.* at 66-68,

98-99.  And Clark had not meaningfully tracked the SIU investigation.[20]  In short, with

---

[20]*See, e.g.*, ECF No. 272 at 73 (Q: "Now, you've testified that there was some
information that [the] SIU asked you to put in [the reservation-of-rights] letter, correct?"
A: "Yes."  Q: "What did you do to verify that the information that [the] SIU was adding
to that letter was accurate?"  A: "That would be part of their investigation, so I would
not—I don't have that specialty to understand their investigation."); ECF No. 265 at 72-
73 (Q: "So why was [the] SIU even involved?"  A: "Because of that anonymous letter."
Q: "All right.  And you don't know whether any of the information in the anonymous
letter is true or false, do you?"  A: "No."  Q: "Has anybody at Selective that you're
aware of looked at that letter to determine whether any of it has any truth or not?"  A: "I
(continued...)

virtually *no knowledge whatsoever* of Sela's alleged fraud, Clark approved Brownson's

recommendation that Sela's claim be denied on the basis of fraud.

The day after Clark approved Brownson's recommendation to deny Sela's claim,

Pack and Steele followed suit.  Def. Ex. 60 at 0062.  They too acted without a reasonable

basis.

As the Court has explained, Pack's entire investigation missed the point.  She

was asked to determine whether Sela committed fraud, yet she did not identify what

Sela said about the repairs to his home and then investigate whether what Sela said was

true.  To the contrary, she admitted that she *did not care* what Sela said—an astonishing

admission from a *fraud* investigator.  *See* ECF No. 273 at 52.  Instead of investigating

fraud, Pack kept insisting that Sela prove how he had managed to repair all of the

damage caused by the 2010 hailstorm while spending only $215,000—something that

Sela never claimed to have done.

Reading Pack's file and watching her testimony makes clear that Pack's

judgment was distorted by personal animosity toward Sela, likely rooted in her

knowledge that he had been convicted of fraud and tax evasion.  Pack treated

---

[20](...continued)
would not know that."  Q: "Who would know?"  A: "Probably [the] SIU Department.");
ECF No. 272 at 63-64 (Q: "Did [the] SIU ever inform you that there was a problem with
notice in this case?"  A: "I don't recall if they did.  I didn't really get into their
investigation."); *see also* ECF No. 265 at 114, 116 (Clark testifying that he does not
believe that he had access to Pack's SIU file).

everything that Sela told her, and everything that he submitted to her, as suspect—even if there was other evidence corroborating it.  For example, when Pack was asked if she had found that any of the invoices that Sela submitted were "false or fabricated," she responded, "Yes, because I cannot verify them."  ECF No. 273 at 30.  Pack's testimony was irrational.  All five businesses that issued the invoices verified that the invoices were authentic and accurate.  Moreover, a couple of those businesses even corroborated the involvement of a couple of the other businesses.  For example, Richard Vassallo (the owner of Vassallo Fabrication and Installation) knew that Sheridan Sheet Metal had done some repairs on the hail damage, Def. Ex. 61 at 0004, and David Stolhanske (the owner of Northeast Sheet Metal) knew that Vassallo had done some work on the hail damage as well, Def. Ex. 117.[21]

Despite overwhelming evidence that the invoices were genuine and that the work described had been done, Pack stubbornly insisted that she could not "verify" them.  ECF No. 273 at 30.  It is unclear what more Pack wanted.  Pack conceded that at no point in her investigation did she ever receive any indication that work listed on the

---

[21]Selective did possess an affidavit—filed in an unrelated state-court action—in which Hector Ramirez swore that Sela had been involved in a fraudulent-invoice scheme with Perfect Touch Construction (one of the five businesses that claimed to have done repairs on Sela's property).  *See* BT Pls. Ex. 16.  But, in a subsequent affidavit, Ramirez swore that the relevant part of his prior affidavit was false and had been added to his original statement without his knowledge.  *See* Def. Ex. 74.  Even a cursory review of the docket of the state-court action would have discovered that Ramirez's affidavit provided no evidence to contradict Sela's claims.

invoices had not been done or that the invoices were otherwise inaccurate.  *Id.* at 46.

She simply refused to believe anything that Sela told her or to credit any document that

he provided to her.

Making matters worse, Pack did little to seek out relevant information from other

sources.  For example, Pack never once reached out to Bill Conrad—the individual who,

on behalf of Lexington, had inspected many of the repairs that Sela had done following

the 2010 hailstorm.  ECF No. 273 at 36.  Pack claimed to not even know that Conrad was

the person whom Lexington had sent to inspect Sela's repairs.  *Id.* at 35-36.  But the

record shows that Pack was told by Sela—repeatedly—that Conrad had been sent by

Lexington to inspect the repairs.  *See, e.g.*, Def. Ex. 49 at 0001; BT Pls. Ex. 8 at 32; Def.

Ex. 60 at 0024.

Pack did hire Ofori-Amanfo to investigate the veracity of some of Sela's

statements, but she did not call Ofori-Amanfo's attention to the information that he

himself said he needed—and then she did not even read the report that she hired him to

produce.  Throughout her investigation, Pack gave no indication that she wanted to

learn whether Sela's statements were true; instead, she appears to have decided at the

outset that he was a liar, and she did not seek or credit any evidence that might have

suggested otherwise.  Pack, like Clark, approved Brownson's recommendation that

Sela's claim be denied on the basis of fraud with almost no basis for believing that anything Sela actually said had been false.

Finally, Pack's supervisor (Steele) never testified at trial and clearly did not play much of a role in the handling of Sela's claim. Steele supervised Pack's misguided and biased investigation. There is no evidence that he ever expressed any concern about her egregious mistakes; instead, he just kept signing off on all of her (and Clark's and Brownson's) recommendations. In fact, Steele parroted Pack's line that Brownson believed that Sela's claim could be denied "because [Sela] told us in his [examination under oath] that all the damages from [the] prior storm were repaired and [Ofori-Amanfo's] report says differently." *See* Def. Ex. 60 at 0061. This was untrue; Selective had a transcript of Sela's examination under oath, and nowhere in that transcript does Sela claim that he repaired "all the damages" from the 2010 hailstorm. Steele also asserted that Selective was justified in denying Sela's claim because it had "confirmed material misrepresentations." *Id.* at 0062. But Steele never identified a single material misrepresentation that Sela actually made that was untrue. Pack's file—Steele's primary (or exclusive) source of information about the claim—also does not identify any such statement. Like Clark and Pack, Steele "acted in reckless disregard of the lack of a reasonable basis for denying the benefits of the insurance policy." Minn. Stat. § 604.18, subd. 2(a).

Selective's conduct throughout this litigation provides further confirmation of its recklessness.  Selective's original complaint— drafted by Brownson—alleged that Sela had committed fraud because, when he signed the proof of loss, he was "aware" "that he had not fully repaired the damages from 2010."  ECF No. 1 at ¶ 69.  But Sela never claimed to have fully repaired the 2010 damages in the proof of loss; to the contrary, in the proof of loss—and in numerous other communications with Selective—Sela told the company that he had *not* "fully repaired the damages from 2010."

A few months later, Sela moved to dismiss Selective's amended complaint.  The Court granted Sela's motion, in large part because Selective had failed to adequately plead fraud.  The Court gave Selective leave to file a second amended complaint, but warned:

> plaintiff must clearly and specifically identify each instance
> in which it alleges that Amit Sela, willfully and with intent to
> defraud, concealed or misrepresented a material fact or
> circumstance.  Plaintiff must identify exactly what Amit Sela
> concealed or misrepresented, and plaintiff must identify the
> exact written or oral communication in which Amit Sela
> committed the concealment or misrepresentation.

ECF No. 32 at 3.

Selective's second amended complaint alleged eight instances of fraud.  Six of those allegations of fraud relied on Ofori-Amanfo's report, which no decision maker at Selective had even read.  One allegation of fraud relied on the Hector Ramirez affidavit,

which had been withdrawn after Ramirez swore that it was a fake.  And the last

allegation of fraud was an assertion that Sela had lied about the cash payments that he

had made to laborers to repair the 2010 damage because—well, because he just had to

have been lying.  *See* ECF No. 34 at ¶¶ 23-30.

Fast forward to the jury trial.  Even though Selective had been ordered to identify

every one of Sela's allegedly fraudulent statements in its second amended complaint,

Brownson's opening statement featured two allegedly false statements that Selective

had not mentioned in its second amended complaint or in either of its prior complaints.

First, Brownson mentioned Sela's alleged statement to Bryan Walton "that the entire

exterior of [the] dwelling was redone approximately 3 years ago."  BT Pls. Ex. 2 at 0001.

And second, Brownson mentioned Sela's statement to Clark that "[o]h, yeah, everything

was done, replaced.  Copper.  See what they had to do—we had to take, like, a foot and

a half from around the house, the edge, because all the flashing goes right into the tile

system."  JT Pls. Ex. 31 at 18.

Not only were these statements not mentioned in any of Selective's complaints,

but these statements were not mentioned by Clark (or anyone else) in the claims file or

by Pack (or anyone else) in the SIU file.  It is absolutely clear that the decision makers at

Selective did not rely on these statements when they decided to deny Sela's claim.

Clark said that he never read Bryan Walton's report (he only looked at the photos), ECF

No. 272 at 61, and Pack said she was not aware of any issues regarding statements that Sela made to Walton, ECF No. 273 at 52-53.

As to the statement that Sela made to Clark: Clark said he never told anyone at Selective about this statement.  ECF No. 265 at 66-67.  Thus, Clark is the only individual at Selective who, in theory, could have relied on the statement in denying Sela's claim. Clark did not do so, however.  As Clark's deposition makes clear, Clark had long forgotten about Sela's statement by the time that he approved Brownson's recommendation to deny coverage.  ECF No. 272 at 82-84.  In fact, Sela's statement would have gone completely unnoticed except that Sela secretly recorded his conversation with Clark and turned over the recording during discovery.  After listening to the recording, Selective's attorneys began to rely upon Sela's statement—a statement that is never mentioned in its files or pleadings and that never crossed the mind of anyone at the time Sela's claim was denied.

Fast forward again, this time to the bench trial.  At the bench trial, Selective's lawyers offered yet more allegedly fraudulent statements on which they contended Selective had relied.  One of those statements was the Vericlaim report—which was not mentioned at all in Selective's complaint, amended complaint, or second amended complaint, and which was mentioned only in passing at the jury trial (and never as an example of Sela's alleged fraud).  At the bench trial, however, Selective's lawyers tried

to make the Vericlaim report the star of their show.  Selective repeatedly emphasized the language that appears in text boxes next to the report's photos, which states that various items "ha[ve] been repaired" or "ha[ve] all been replaced."  BT Pls. Ex. 5. Selective argued that this text showed that Sela had tried to fool it into thinking that all of the repairs had been completed.

Selective conveniently failed to acknowledge that Sela made clear before he submitted the Vericlaim report that it was not accurate and that he had not completed all of the repairs.  JT Pls. Ex. 31 at 4-5; JT Pls. Ex. 32 at 4; Def. Ex. 49.  Moreover, it is clear that Selective's decision makers did not rely on any assertions made in the Vericlaim report, as Clark never looked it, ECF No. 272 at 55, and as Pack did not rely on it or investigate it, ECF No. 273 at 52-53, 60.

Selective should be embarrassed.  Any reasonable insurer that denied its insured hundreds of thousands of dollars of indemnification on the basis of fraud would have no difficulty identifying (1) who made that decision and (2) the fraudulent statements on which the decision was based.  And yet, throughout this litigation, Selective has repeatedly changed its story, making multiple contradictory assertions about who decided to deny Sela's claim and which statements of Sela's were fraudulent.  Selective has flailed about for an explanation for its decision precisely because it did not have a

"reasonable basis" for its decision and because it "acted in reckless disregard of the lack of a reasonable basis."  Minn. Stat. § 604.18, subd. 2(a).  Selective acted in bad faith.

## B.  *"Taxable Costs"*

Because Selective acted in bad faith, Sela is entitled to an award of "taxable costs."  *See* Minn. Stat. § 604.18, subds. 2 & 3.  "[T]axable costs" include "an amount equal to one-half the proceeds awarded that are in excess of an amount offered by the insurer at least ten days before the trial begins or $250,000, whichever is less."  Minn. Stat. § 604.18, subd. 3(a)(1).  The parties dispute what was the highest "amount offered" by Selective to settle Sela's claim, and it appears that they also dispute the amount of proceeds that Sela has been awarded.

### 1.  Amount Offered

Selective argues that its highest offer was made on May 23, 2019, at a settlement conference mediated by Magistrate Judge Steven E. Rau (who is now deceased). Selective's representative at that conference (Mark Vandegraft) testified that his highest offer was $115,000, and that he made that offer to Sela through Judge Rau.  ECF No. 273 at 4-5.  Sela, meanwhile, testified that he was never told that Selective made a $115,000 offer.  ECF No. 272 at 39.  Instead, the highest offer of which he was aware was $65,000. *Id.*; Def. Ex. 172.

Having listened to the conflicting testimony—and being aware of how magistrate judges typically conduct settlement conferences in this District—the Court believes that Judge Rau was trying to gauge whether there was any overlap between the parties' positions.  He privately asked Selective what was the highest offer that it was willing to make, and he privately asked Sela what was the lowest offer that he was willing to accept.  Judge Rau was not asking Selective to make its highest offer or Sela to make his lowest demand.  Instead, Judge Rau was merely trying to figure out whether there was any overlap between the parties' positions—that is, a range within which the case might settle.  That is the most likely scenario, and that is the most likely reason for the conflicting testimony.

The Court therefore credits Sela's testimony and finds that the highest "amount offered by the insurer" for purposes of Minn. Stat. § 604.18, subd. 3(a)(1) was $65,000.

## 2.  Proceeds Awarded

The parties seem to disagree about the amount of the "proceeds awarded" to Sela in this action, although the parties have not briefed this specific issue.  Selective likely would argue that the "proceeds awarded" are $493,789 (the ACV award), because that is all that Sela is entitled to recover until he completes repairs.  Sela contends that the "proceeds awarded" are $596,734 (the RCV award), *see* ECF No. 235 at 8,

presumably because Sela will be entitled to recover that amount if he completes repairs and spends the necessary funds.

The Court finds that, upon entry of judgment pursuant to this order, the "proceeds awarded" will be $493,789. At this point, the Court cannot find that Sela is entitled to more than $493,789, because any recovery above the ACV is conditioned on Sela completing repairs and spending more than the ACV in the process, and because the record does not contain any evidence that this condition has been met.

Accordingly, Sela is presently entitled to taxable costs totaling $214,394.50,[22] plus up to $100,000 in reasonable attorney's fees. Sela will presumably move for attorney's fees under Fed. R. Civ. P. 54(d)(2) after judgment is entered, and the Court will determine the amount of fees to which he is entitled when it rules on that motion. Should Sela complete repairs and become entitled to some or all of the holdback, he will be entitled to recover additional taxable costs. Those additional taxable costs would be calculated by taking the amount of the holdback to which Sela is entitled and dividing by two, for up to an additional $35,605.50.

### C. Interest Calculation

"When a judgment or award is for the recovery of money," Minnesota law authorizes the award of prejudgment interest on the "pecuniary damages." Minn. Stat.

---

[22]The Court arrives at this figure by taking the $493,789 ACV award, subtracting the $65,000 settlement offer, and dividing by two.

§ 549.09, subd. 1.  Prejudgment interest accrues from the earliest of three potential

triggering events.  *See* Minn. Stat. § 549.09, subd. 1(b).  The parties first disagree about

whether there has been a triggering event.  The parties then disagree about the amount

of "pecuniary damages" on which any award of prejudgment interest should be based.

The Court will address the issues in turn.

### 1.  Triggering Event

If "a judgment or award is for the recovery of money," Minnesota provides for

prejudgment interest from the earliest of three events: (1) the action being commenced,

(2) arbitration being demanded, or (3) written notice of the claim being made (provided

that the party commences the action within two years after giving written notice).

Minn. Stat. § 549.09, subds. 1(a) & 1(b).  Selective argues that none of these triggering

events occurred and thus that prejudgment interest never began to accrue.  ECF No. 263

at 7-19.[23]  Sela concedes that he did not make a demand for arbitration, and he does not

rely on his demand for appraisal (which Selective rejected) as the triggering event.  ECF

---

[23]Selective also argues that because its policy limits coverage to "not more than
the least of the following amounts," and then lists amounts that do not expressly
contemplate interest, its policy does not provide for interest.  ECF No. 263 at 4-5.  But
the fact that Selective's policy "does not mention . . . interest," *id.* at 4, is exactly why
prejudgment interest is available.  Section 549.09 is a default rule; it instructs courts to
award prejudgment interest in cases in which interest is not "otherwise provided by
contract . . . ."  Minn. Stat. § 549.09, subd. 1(b).  Because Sela's policy says nothing about
interest—neither expressly providing for it nor expressly precluding it—§ 549.09
controls.

No. 270 at 5-6.[24]  Instead, Sela argues that he gave Selective written notice of his claim and then—within two years of that written notice—he commenced this action, which led to the recovery of money.  *Id.* at 6-9.

The Court agrees with Sela.  Sela brought a counterclaim against Selective alleging breach of the insurance contract.  ECF No. 37 at ¶¶ 76, 78, 81.  Selective contends that Sela's counterclaim did not lead to the recovery of money, relying on the fact that only one question was posed to the jury: whether Sela had committed fraud. *See* ECF No. 263 at 14-15 (citing the jury verdict form, ECF No. 186).  But because the only basis Selective cited for denying coverage to Sela was fraud, when the jury found that Sela had not committed fraud, the jury necessarily found—as a matter of law and logic—that Selective breached the insurance contract and had to pay damages to Sela. Consequently, the Court will enter judgment for the recovery of money in favor of Sela. Sela is therefore entitled to prejudgment interest.[25]

---

[24]At Selective's request, the Court permitted supplemental briefing regarding a recent Minnesota Supreme Court decision—*Oliver v. State Farm Fire and Casualty Insurance Company*, 939 N.W.2d 749 (Minn. 2020).  But because Sela does not contend that his demand for appraisal is the triggering event that entitles him to an award of prejudgment interest, *Oliver* is irrelevant.

[25]Selective also seems to contend that, because judgment has yet to be entered on Sela's breach-of-contract counterclaim, and because Selective has already paid Sela the ACV award, no judgment can ever be entered against it, "as the award has been paid." ECF No. 263 at 15.  Again, Selective is incorrect.  Pursuant to this order, the Clerk of Court will enter judgment in favor of Sela on his breach-of-contract counterclaim.  That

(continued...)

Sela served and filed his counterclaim on April 17, 2017, and thus, at the latest, prejudgement interest began to accrue on that date.  The Court finds, however, that prejudgment interest began to accrue before April 17, 2017, because prior to that date Sela provided written notice of his claim, and Sela then filed his counterclaim within two years.  Minn. Stat. § 549.09, subd. 1(b).

"Written notice of claim" is not defined by the statute, but courts have consistently found it "simply means a demand for payment (or other similar assertion) contained in writing."  *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 845 F. Supp. 2d 975, 978 (D. Minn. 2012).  It is not necessary that the claimant specify the precise amount of money that he seeks; instead, the claimant must merely inform the opposing party of his claim in a manner that would allow the opposing party to assess its potential liability.  *See, e.g., Creekview of Hugo Ass'n, Inc. v. Owners Ins. Co.*, 386 F. Supp. 3d 1059, 1068 (D. Minn. 2019); *Indep. Sch. Dist. 441 v. Bunn-O-Matic Corp.*, No. C0-96-594, 1996 WL 689768, at *10 (Minn. Ct. App. Dec. 3, 1996).

Selective received written notice of Sela's claim on July 8, 2015.  *See* Def. Ex. 124; ECF No. 272 at 5-6.  The Court deems this to be a demand for payment.  *Creekview*, 386

---

[25](...continued)

judgment will provide that Sela is presently entitled to recover the ACV award (along with taxable costs and interest), and, if Sela completes the repairs and spends the necessary funds, Sela will be entitled to some or all of the holdback (as well as more taxable costs and interest).  If Selective has already paid Sela the ACV award, Selective will simply have partially satisfied the judgment.

F. Supp. 3d at 1068-69.  Moreover, the information that Sela provided would have enabled Selective to assess its potential liability.  *See id.* at 1067-71; *see also Savanna Grove Coach Homeowners' Ass'n v. Auto-Owners Ins. Co.*, No. 19-CV-1513 (ECT/TNL), 2020 WL 468905, at *8-9 (D. Minn. Jan. 29, 2020) (finding an email sent to the insurer which sought to open an insurance claim for hail damage to the property was written notice of the claim); *Bunn-O-Matic Corp.*, 1996 WL 689768, at *10 (finding a letter which stated that the company's coffee machine caused a fire which destroyed the school was written notice of the claim).

The Court acknowledges that other judges in this District have come to contrary conclusions.  *See Herll v. Auto-Owners Ins. Co.*, No. 15-CV-3104 (MJD/FLN), 2018 WL 4759833, at *4 (D. Minn. Oct. 2, 2018) (finding an insured's email to his insurer seeking to start the claims process was not written notice of his claim because there was no demand for payment in the email); *Hous. & Redevelopment, Auth. of Redwood Falls v. Hous. Auth. Prop. Ins.*, No. 14-CV-4741 (PAM/HB), 2017 WL 5197135, at *2–3 & n.2 (D. Minn. Nov. 8, 2017) (same).  But the undersigned respectfully disagrees with those decisions.  In the undersigned's view—and in the view of Judge Eric Tostrud—filing a first-party claim with a homeowner's insurer is a demand for payment, as "[t]he only reason an insured would open a claim with its insurance carrier is that it believed its loss was covered under the applicable policy and that it claimed some amount of

payment from the insurer for the damage." *Creekview*, 386 F. Supp. 3d at 1068.

Moreover, "Minnesota courts have been clear that a party need not demand a specific

dollar amount to trigger pre-award interest." *Id.* at 1069.  To require an insured to do

something more than "open[] a claim for hail damage," but something less than

"mak[e] a specific monetary demand," would require courts to "identify some

intermediate level of specificity not suggested by the statute [or by] Minnesota case law

. . . ." *Id.*  This Court declines to adopt such an arbitrary and unworkable standard.[26]

### 2.  Pecuniary Damages

The parties next disagree about whether the "pecuniary damages" on which Sela

is entitled to recover interest is the ACV award ($493,789) or the RCV award ($596,734).

Sela argues that he is presently entitled to payment of interest on the RCV award.

Selective responds that Sela will never be entitled to payment of interest on the RCV

award, as the RCV award represents "future damage" on which interest cannot be

---

[26]Selective also appears to argue that the property-loss notice was not "written notice" of Sela's claim because Sela did not himself submit the notice.  ECF No. 263 at 16-17.  The Court cannot tell if Selective is claiming that the problem is that Sela's insurance agent submitted the notice on Sela's behalf, or if Selective is claiming that the notice was internally generated at Selective.  If the former, obviously Sela's agent providing Selective with written notice on Sela's behalf constitutes written notice under the statute.  If the latter, the Court notes that it has no evidence that the property-loss notice was an internally generated form; the only evidence in the record suggests that Sela's agent submitted the notice to Selective.  ECF No. 272 at 5-6.  Moreover, in other places in its brief, Selective seems to concede that Sela submitted the notice to it.  *See* ECF No. 263 at 1-2 ("On July 8, 2015, Sela notified Selective of the damage *by submitting* a Property Loss Notice." (emphasis added)).

awarded.  According to Selective, Sela is entitled to interest only on the ACV award.

The Court disagrees with both Sela and Selective.  The Court finds that Sela—today—is

entitled to interest on only the ACV award, but also finds that Sela—in the

future—could be entitled to interest on the RCV award.

In *Poehler v. Cincinnati Insurance Company*, an insurer argued that its contractual

loss-payment provision controlled the date on which interest began to accrue.  899

N.W.2d 135, 141-42 (Minn. 2017).  Specifically, because the insurance policy provided

that the insurer did not need to pay a loss until five days after the filing of an appraisal

award, the insurer contended that interest did not accrue before that date.  *Id.*  The

insured, meanwhile, argued that the loss-payment provision of the policy only

addressed the question of when the appraisal award had to be paid; it did not address

the question of when interest on that award began to accrue.  *Id.* at 142.  The Minnesota

Supreme Court agreed with the insured, holding that "absent contractual language

explicitly precluding preaward interest, an insured may recover preaward interest on

an appraisal award . . . notwithstanding a contractual loss payment provision" that

controls when the loss is payable.  *Id.*  The court reasoned that the question of when a

payment for a loss is due is separate from the question of when interest on that

payment begins to accrue.  *Id.* at 143.  As the court put it, "[t]he loss payment provision

in Cincinnati's insurance policy governs only when a covered loss is payable; it does not

speak to when interest begins to accrue, which can be months or even years before the payment is due." *Id.*

The Court finds that, under *Poehler*, interest began to accrue on both the ACV and RCV awards on July 8, 2015, when Selective received written notice of Sela's claim. The fact that the terms of Sela's insurance policy do not provide for payment of the full RCV award until Sela completes repairs is not relevant to when interest began to accrue on the RCV award. *See Creekview*, 386 F. Supp. 3d at 1071 (holding that, under *Poehler*, an insured was entitled to interest on the full RCV award from the time of written notice of the claim).

Selective argues that this cannot be the case, as the RCV award is an award for "future damages," and Minnesota does not allow interest on future damages. *See* ECF No. 263 at 19-20; Minn. Stat. § 549.09, subd. 1(b)(2). The Court disagrees. The RCV award does not compensate Sela for a loss that he will suffer in the future; the RCV award compensates Sela for a loss that he suffered five years ago. The fact that Selective is not required to pay Sela for his entire loss until he completes repairs simply means that Sela cannot recover for past damage until a condition is met.

Thus, the Court concludes that Sela may be entitled to interest on the RCV award, and if he becomes so entitled, the interest on the RCV award started accruing on July 8, 2015. But the Court does not believe that Sela is presently entitled to recover

interest on the RCV award.  In both *Poehler* and *Creekview*, the insured did not have to do anything more to be entitled to payment of the full appraisal award.  Because the insured in each of those cases was entitled to payment of the award, the insured was also entitled to payment of interest on the award.  Here, Sela is entitled to payment of his ACV award, but not his RCV award.  It does not make sense to make Selective pay interest today on an award that Sela may never be entitled to collect.  If Sela never becomes entitled to the holdback, he will never become entitled to be paid interest on the holdback.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.  Defendant/counter-claimant Amit Sela shall recover a total of $924,233.10 from plaintiff/counterdefendant Selective Insurance Company of South Carolina.  This includes:

  a.   $493,789.00 in insurance proceeds under Sela's contract, representing the ACV of the losses that he suffered in the 2015 hailstorm.

  b.   $216,049.60 in prejudgment interest on the ACV award.[27]  And

---

[27]The Court arrived at this figure as follows:

It first determined the number of days for which Sela is entitled to interest.  Sela
(continued...)

    c.        $214,394.50 in taxable costs.

    2.  Sela may move under Fed. R. Civ. P. 54(d)(2) for an award of reasonable attorney's fees, not to exceed $100,000, pursuant to Minn. Stat. § 604.18, subd. 3(a)(2).

    3.  In the event that Sela incurs repair or replacement costs in excess of $493,789, he is entitled to the following additional payments from Selective:

    a.        The cost of the repairs or replacements, up to a cap of $102,945.

    b.        Interest on any additional insurance proceeds that Sela is awarded under ¶ 3(a) of this order, calculated as follows:  Take the additional insurance proceeds that Sela is awarded under ¶ 3(a), multiply by the 10% interest rate, multiply by 1749 (the number of days for which Sela is entitled to prejudgment interest), and divide by 365 (the average number of days in a year).

---

[27](...continued)
is entitled to interest from the date that Selective received written notice of his claim (July 8, 2015) to the date that Selective made the ACV payment (November 21, 2019). Like Sela, the Court calculated 1597 days.  *See* ECF No. 262 at 3.

    The Court then took the 1597 days and divided by the typical number of days in a year (365 days), then multiplied by the interest rate (10%), and then multiplied by the amount of the ACV damages ($493,789).  The Court's interest calculation is slightly different than Sela's, as Sela was calculating interest based on $493,798 in ACV damages.  ECF No. 262 at 3.  But the proper ACV damage amount is 493,789.  Def. Ex. 165.

c.      Taxable costs on any additional insurance proceeds to which Sela is

entitled under ¶ 3(a) of this order, calculated as follows:  Take the

additional insurance proceeds that Sela is awarded under ¶ 3(a) and

divide by two, for up to an additional $35,605.50.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  April 21, 2020                        s/Patrick J. Schiltz
                                              Patrick J. Schiltz
                                              United States District Judge